U.S. COURTS

DEC 29 2014

Filed____Time____
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

# United States Court of Appeals
# for the Federal Circuit

---

**HOYT A. FLEMING,**
*Plaintiff-Appellant,*

v.

**ESCORT INC. AND BELTRONICS USA, INC.,**
*Defendants-Cross-Appellants.*

---

2014-1331, -1371

---

Appeal from the United States District Court for the District of Idaho in No. 1:09-CV-00105-BLW, Chief Judge B. Lynn Winmill.

---

Decided: December 24, 2014

---

MICHAEL S. DOWLER, Park, Vaughan, Fleming & Dowler, LLP, of Houston, Texas, argued for plaintiff-appellant.

GREGORY F. AHRENS, Wood, Herron & Evans, L.L.P., of Cincinnati, Ohio, argued for defendants-cross-appellants. With him on the brief was BRETT A. SCHATZ.

---

Before TARANTO, BRYSON, and HUGHES, *Circuit Judges.*

FLEMING v. ESCORT INC.

TARANTO, *Circuit Judge.*

The district court in this case refused to disturb a jury verdict concerning two reissue patents. The jury found for the patentee on infringement and validity as to most of the asserted claims, but it invalidated five claims. The patentee, Hoyt Fleming, appeals the five invalidity determinations, arguing that (1) the testimony offered to establish invalidity was insufficiently specific to support the verdict; (2) there was insufficient corroboration of the prior invention relied on for the invalidity determinations; and (3) the prior invention, if it existed, was abandoned, suppressed, or concealed, disqualifying it from invalidating the claims. The adjudicated infringers, Escort, Inc., and Beltronics USA, Inc. (collectively, Escort), cross-appeal on the ground that all of the asserted claims are invalid because Fleming's reason for seeking reissue did not meet the "error" precondition for obtaining reissue. We affirm.

## BACKGROUND

Hoyt Fleming owns two reissue patents—U.S. Patent Nos. RE39,038 (issued Mar. 28, 2006) and RE40,653 (issued Mar. 10, 2009)—issued under 35 U.S.C. § 251. Both relate to radar detectors for detecting police signals. They claim methods for incorporating, as well as apparatuses that incorporate, a Global Positioning Satellite (GPS) unit into a radar detector. The incorporated GPS can reduce false alarms (*i.e.*, the signaling of a police presence when none exists) by allowing the detector to disregard, or "lock out," certain signals from an identified location known to produce such false alarms (*e.g.*, a storefront door opener transmitting a radar signal that can be mistaken for a police presence).

Claim 1 of the '038 patent is representative of the method claims. It reads:

> 1.  A method, executed by a device having a posi-
> tion, of generating an alert to an incoming radar
> signal having a frequency and a signal strength,
> the method comprising the acts of:
>
> (a) detecting the incoming radar signal;
>
> (b) determining the position of the device that de-
> tected the incoming radar signal; and
>
> (c) generating an alert if the position of the device
> is not within a predetermined distance of a prede-
> termined position.

'038 patent, col. 6, lines 49–58.

Claim 18 of the '038 patent is representative of the apparatus claims.  It reads:

> 18.  A radar detector for alerting an operator of a
> motor vehicle to an incoming police radar signal
> comprising:
>
> (a) a microprocessor;
>
> (b) a circuit coupled to the microprocessor for de-
> tecting the incoming police radar signal; and
>
> (c) a global positioning system receiver coupled to
> the microprocessor and operable to provide the
> microprocessor with data that indicates the posi-
> tion of the radar detector.

'038 patent, col. 7, lines 53–61.

On March 10, 2009, Fleming sued Escort for in-
fringement of his two patents.  At the heart of Escort's
defenses was the contention that Steven Orr, who works
for Escort as a consultant, had invented a GPS-
incorporating radar detector before Fleming did—a prior
invention Escort invoked to support anticipation and

4                                        FLEMING v. ESCORT INC.

obviousness challenges under 35 U.S.C. §§ 102(g) and 103
(2006).[1]    Fleming's claimed priority date is April 14,
1999—the filing date of his original patent application.
Orr alleged that he conceived his invention in 1988 and
made a working embodiment that reduced it to practice in
April 1996.   From 1988 to 1996, Orr was working at
Cincinnati Microwave, which owned the potential patent
rights to the alleged invention at issue.   Cincinnati Mi-
crowave entered bankruptcy on February 14, 1997.  With
Orr assisting in the bankruptcy process, Escort acquired
Cincinnati Microwave's assets, including the potential
patent rights to the alleged Orr invention, during the
summer of 1997.   Escort sought Orr's assistance in the
new enterprise, and Orr began working at Escort in July
1998.  He filed a patent application to claim his alleged
invention, with Escort as assignee, on June 14, 1999, two
months after Fleming filed his application.

The jury in this case found most of Fleming's asserted
claims to be infringed by Escort and not to be invalid.  It
found invalidity, however, as to five claims of the '038
patent—claims 1, 18, 45, 47, and 48.  The jury invalidated
claim 45 as anticipated by Orr's prior invention.  It inval-
idated claim 18 as anticipated by the Orr invention and
also for obviousness in light of Orr's invention and two
prior-art patents, Hoffberg (U.S. Patent No. 6,252,544)

---

[1]    This case is governed by the statutory provisions
in effect before the Leahy–Smith America Invents Act
(AIA), Pub. L. No. 112-29, § 3, 125 Stat. 284, 285–93
(2011), put into effect revisions of many provisions of Title
35 of the U.S. Code, including sections 102, 103, and 251.
*See* AIA § 3(n)(1), 125 Stat. at 293 (relevant AIA amend-
ments apply only to applications and patents containing a
claim with an effective filing date of March 16, 2013, or
later).  We hereafter omit a date in citing the statutory
provisions.

and Ross (U.S. Patent No. 5,977,884). And it invalidated claims 1, 47, and 48 for obviousness in light of Orr's prior invention and two prior-art patents, Hoffberg and Valentine (U.S. Patent No. 5,146,226).

Fleming subsequently sought judgment as a matter of law to reverse the jury's five invalidity determinations. He argued that the testimony regarding invalidity was conclusory, that Orr's testimony regarding his prior invention was insufficiently corroborated, and that Orr's prior invention—even if it existed—had been abandoned, suppressed, or concealed within the meaning of 35 U.S.C. § 102(g)(2), disqualifying it as a basis for invalidity. Escort, in turn, sought judgment that Fleming's patents were invalid, arguing that Fleming had not identified an "error" in his original patent (U.S. Patent No. 6,204,798), a prerequisite to securing a reissue patent under section 251. The district court denied both sides' motions.

Both parties appeal the district court's decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review the denial of a motion for judgment as a matter of law de novo, applying the same standards as did the district court in deciding whether the jury verdict must be reversed. *See Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1341 (Fed. Cir. 2010) (applying Ninth Circuit law). In doing so, we accept express or implied jury factual determinations, if supported by substantial evidence, and assess whether those facts support the judgment under the governing legal standards, whose interpretation we review de novo. *See, e.g., Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed. Cir. 1995) (applying Ninth Circuit law); *Pierce v. Underwood*, 487 U.S. 552, 558 (1988). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from

the evidence." *Landes Const. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987).

### A

### 1

Fleming's first contention on appeal from the five invalidity verdicts is that Escort's evidence in support of invalidity was insufficiently specific to support the verdict. Fleming's argument invokes our rulings that "[g]eneral and conclusory testimony . . . does not suffice as substantial evidence of invalidity." *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004); *see CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1176 (Fed. Cir. 2005); *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). It is not enough simply to introduce a prior-art reference into the record, with no testimony showing where the limitations of the claims are to be found. *Koito*, 381 F.3d at 1151–52; *see also Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1300 (Fed. Cir. 2009). In this case, the principal prior art was not a patent or publication but the prior invention of Orr, who testified extensively about it.

We conclude that there was sufficiently specific factual support for the invalidity determinations. The jury's verdict on invalidity rested on two overlapping classes of findings. The first concerned Orr's prior invention, which the jury found to anticipate claims 18 and 45—a question of fact. *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*, 375 F.3d 1126, 1133 (Fed. Cir. 2004). The second concerned the teachings of the asserted combinations of Orr's prior invention and Hoffberg, Ross, and/or Valentine. The content of those teachings and the motivation to combine are fact questions, *see Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360, 1367 (Fed. Cir. 2012), which we assume the jury answered in Escort's favor in finding claims 1, 18, 47, and 48 invalid for obvi-

ousness.    Sufficiently specific evidence supported the jury's findings.

The invalidated claims do not contain a large number of limitations, so extensive testimony was not required. Nevertheless, Orr and Escort's expert, Dr. Grindon, together provided testimony that explained how the prior art taught the limitations of each invalidated claim.

For example, claim 45 recites two limitations: (1) "a circuit operable to detect an incoming radar signal" and (2) "a microprocessor operable to disable an alert to the incoming radar signal based at least in part upon the position of the radar detector." '038 patent, col. 10, lines 24–30.  As to the first limitation, Orr explained that part of his invention consisted of a radar detector that received frequency information, allowing the detection of radar signals.   J.A. 6198.   As to the second limitation, Orr explained that the radar detector was connected to a GPS navigational card and a laptop, allowing the muting of certain signals "when [he] hit the spacebar" based on position information expressed in cylindrical coordinates. J.A. 6198.  As to both limitations, Dr. Grindon evaluated evidence of Orr's prior invention, including files that showed "routes that [Orr] took driving around under different conditions to collect . . . position and velocity information from a GPS device in his car," J.A. 6324, and explained that Orr's invention "definitely shows and discloses . . . the combination for a radar detector with a GPS system . . . combined with a processor, in this case a laptop computer . . . [to] suppress[] . . . false alerts . . . based upon location . . . [and] the speed of the car . . . [by] press[ing] the space bar on the laptop," J.A. 6325.

With regard to the other invalidated claims, Dr. Grindon testified in some detail to the aspects of Hoffberg, Ross, and Valentine—as well as the motivation to combine—that would have made the claimed subject matter obvious at the relevant time. *E.g.*, J.A. 6328–29 (describ-

ing how Hoffberg "teach[es] . . . radar detection . . . in . . . various frequency bands" and "stor[ing] information . . . to discriminate against false alarms"); J.A. 6330–31 (describing how Ross "integrat[es] a system with a radar detector and a GPS, and then a processor . . . [to] address[] the same problem of false alarms and false alerts" through a comparison of "[t]he speed of the vehicle, which is derived from the GPS unit, . . . with [a] preset maximum"); J.A. 6332–33 (describing how Valentine "address[es] the problem of false alerts in a very similar, but slightly different, way [from Hoffberg]," by "discriminat[ing] the signals based on frequency . . . in the same way [as Orr's prior invention]").

In light of this and other testimony, we cannot say that the invalidity challenge was supported by only conclusory testimony and unexplained prior-art documents. There was specific evidence sufficient to support the verdict.

### 2

Fleming also challenges the proof of Orr's prior invention by invoking the principle that "oral testimony by an alleged inventor asserting priority over a patentee's rights . . . must be supported by some type of corroborating evidence." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) (citation and internal quotation marks omitted). Such evidence is evaluated under "the rule of reason," whereby "all pertinent evidence is examined in order to determine whether the inventor's story is credible." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) (citations and internal quotation marks omitted); *see also Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006) ("corroboration is fundamentally about 'credibility'"). Importantly, "[t]he law does not impose an impossible standard of independence on corroborative evidence by requiring that every point of a

reduction to practice be corroborated by evidence having a source totally independent of the inventor; indeed, such a standard is the antithesis of the rule of reason." *Cooper v. Goldfarb*, 154 F.3d 1321, 1331 (Fed. Cir. 1998) (citation and internal quotation marks omitted). We have treated the sufficiency of corroboration as a question of fact, with the district court's determination subject to review for clear error. *Medichem*, 437 F.3d at 1171–72.

Here, Orr's testimony of prior invention was sufficiently corroborated by the documentary evidence. The record contains 1992 data from GPS experiments that Orr ran at the time, *e.g.*, J.A. 7757 (frequency plot entitled "Ka band in False Region Record"), and 1996 notes and correspondence from Orr pertaining to GPS and, more specifically, to "realizing product features identified in . . . [a] brainstorming meeting . . . [by] integrat[ing] a radar detector into . . . automotive navigation systems," J.A. 7352–53. Most tellingly, perhaps, the record contains a 1996 letter from Greg Blair, Vice President of Cincinnati Microwave, addressed to Orr and other employees, which refers to "entering the ETAK [a type of automotive navigation system] business . . . to get speed and position to silence a detector" and to "patent[ing] the concept of . . . vehicle position muting and then working with the ETAK folks for a data link to our detectors," J.A. 7354.

This evidence makes credible Orr's general account: in 1988, when he had his specific conception, various industry participants were thinking generally about equipping radar detectors with GPS to reduce false alarms; Cincinnati Microwave, in particular, was interested in the idea; by 1992, Orr was collecting data and working toward reducing the conception to practice; and in 1996, spurred by great interest in his project, Orr reduced his invention to practice. The evidence, in referring to frequencies and to using a GPS-given location to mute a detector alarm, also provides substantial corroboration of the more specif-

ic claim limitations concerning lockout frequencies and distances that Fleming has highlighted in his argument.

Fleming is correct that none of the corroborating evidence constitutes definitive proof of Orr's account or discloses each claim limitation as written. But the corroboration requirement has never been so demanding. *See Cooper*, 154 F.3d at 1331. It is a flexible, rule-of-reason demand for independent evidence that, as a whole, makes credible the testimony of the purported prior inventor with regard to conception and reduction to practice of the invention as claimed. *Sandt*, 264 F.3d at 1350–51. The evidence presented here sufficiently does that.

3

Fleming's final challenge is that, even if Orr had priority of invention by virtue of his activities through 1996, he lost priority under 35 U.S.C. § 102(g)(2)'s disqualification of prior inventions that have been "abandoned, suppressed, or concealed." Although we accept the facts as found by the jury where (as here) they are supported by substantial evidence, we have said that "[s]uppression or concealment is a question of law which we review de novo." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1567 (Fed. Cir. 1996). We reject Fleming's challenge.

Abandonment, suppression, or concealment may be shown by proof of the prior inventor's active efforts to do so or "may be inferred based upon the prior inventor's unreasonable delay in making the invention publicly known." *Dow Chem. Co. v. Astro–Valcour, Inc.*, 267 F.3d 1334, 1342 (Fed. Cir. 2001); *see also Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1305–06 (Fed. Cir. 2012). Whether a delay is sufficiently reasonable to avoid the inference "has consistently been based on equitable principles and public policy as applied to the facts of each case." *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed. Cir. 1995) (citation and internal quotation marks

omitted).  For example, "delay between the first reduction to practice and public disclosure" is excused "if the inventor continued to refine, perfect, or improve the invention." *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1333 (Fed. Cir. 2005).  Moreover, even "a long period of inactivity need not be a fatal forfeiture, if the first inventor resumes work on the invention before the second inventor enters the field." *Paulik v. Rizkalla*, 760 F.2d 1270, 1272 (Fed. Cir. 1985).

In this case, there is no evidence of any active efforts to suppress or conceal.  And we find the timing of Orr's activities leading to his June 1999 patent application not to warrant an inference of abandonment, suppression, or concealment.  The evidence is sufficient to establish the following facts, covering three periods starting from the April 1996 reduction to practice.

In the first period, *before* the February 1997 date of Cincinnati Microwave's bankruptcy, Cincinnati Microwave had great interest in the project, J.A. 6094, and Orr studied, refined, and improved his invention: he studied "selective availability," *i.e.*, signal interference by the military that impaired the use of his invention, J.A. 6095, and conducted field testing and wrote additional code to perfect his invention, J.A. 6104–22.  In the third period, *after* Orr started working at Escort in the summer of 1998, he was immediately put to work on his invention, and he continued this work at least until he filed for his own patent in June 1999.  *E.g.*, J.A. 6293 (Escort's Kuhn testifying that Escort was motivated to hire Orr because of Orr's expertise in radar/GPS, and that Kuhn told Orr to work on his invention once he joined Escort), J.A. 7494–546 (Orr's timesheets at Escort from July 1998 to July 1999, mentioning work on radar/GPS work, including "Ka falsing improvements").

What happened in the middle period—*between* February 1997 and summer 1998—is this: For a period of

"approximately 13 months after the bankruptcy," Orr joined another firm to work with "a group of engineers that were designing a cordless telephone." J.A. 6123. The patent rights to Orr's radar/GPS prior invention, created at Cincinnati Microwave, were acquired by Escort in the bankruptcy, and Escort set priorities to get its new business going but, even so, was interested in developing this invention. Orr testified that, from the middle of 1997 to the middle of 1998, while working elsewhere, he was giving Escort information about his invention, J.A. 6182, and that Escort was pursuing Orr's invention and conferring with Orr about it during that period, J.A. 6184. Escort's Kuhn testified that, from the start, Escort was motivated to hire Orr because of Orr's expertise in radar/GPS, was seeking to hire him during its startup period, and finally did hire Orr, in July 1998, to adapt his invention to "a new detection scheme" to resolve performance issues. J.A. 6287–93.

In these circumstances, we do not infer suppression, concealment, or abandonment for two reasons. First: In making his argument in this court and in the district court, Fleming's position has been that his priority date is April 14, 1999, when he filed his patent application. That date is later than the dates of Orr's conception (1988) and reduction to practice (1996)—not in dispute for purposes of the present issue. It also is later than the latest possible date—summer 1998—that the evidence establishes Orr resumed work on his prior invention when joining Escort. Even if the focus were solely on Orr (thus disregarding Escort, the patent-rights owner), and even if Orr had abandoned his invention before summer 1998, the defense of abandonment is properly rejected on the ground that Orr resumed his active work before Fleming's April 1999 priority date. *See Paulik*, 760 F.2d at 1272.

Second: Although Fleming has not made an argument based on a pre-1999 priority date, the conclusion would not change even if we assumed a May 1998 conception

date for Fleming (for which there is evidence).  On that assumption, the crucial period for the abandonment analysis would be the time between Cincinnati Microwave's February 1997 bankruptcy and Orr's July 1998 employment at Escort.  But what occurred during that period does not warrant an inference of suppression, concealment, or abandonment.  At most, there was a reasonable pause in active work: the rights to the invention were transferred from one owner to a new owner during a period of bankruptcy; the new owner concentrated its initial efforts on products ready for immediate sale; and even during that period, the new owner maintained communication with Orr and made efforts to bring him to the firm precisely to resume the work needed to perfect the prior invention.  The delay of active work in these circumstances was not unreasonable and was consistent with a continuing commitment to pursuing the project to the full extent conditions allowed.  In brief, the concepts of abandonment, suppression, and concealment do not fit the facts as reasonably found by the jury.

## B

Escort, in its cross-appeal, argues that Fleming's reissue patents are invalid because there was no "error" in the original patent, a prerequisite to obtaining a reissue patent.  "Determining whether an applicant has met the statutory requirements of 35 U.S.C. § 251 is a question of law, which we review *de novo*."  *In re Clement*, 131 F.3d 1464, 1468 (Fed. Cir. 1997).  We reject Escort's contention.

The version of section 251 applicable here reads:

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Director shall, on the

surrender of such patent and the payment of the
fee required by law, reissue the patent for the in-
vention disclosed in the original patent, and in ac-
cordance with a new and amended application, for
the unexpired part of the term of the original pa-
tent.

35 U.S.C. § 251 (2006).

Escort invokes the requirement that there have been
an "error" in the original patent. Errors are not limited to
slips of the pen but encompass—and most often are—
deliberate drafting choices. *See In re Dinsmore*, 757 F.3d
1343, 1347–48 (Fed. Cir. 2014). Not all choices qualify,
though: "it is important whether deficient understand-
ings, by the applicants or their agents, gave rise to the
patenting choice that reissue is being invoked to correct."
*Id.* at 1348. A drafting choice that rested on "no cogniza-
ble false or deficient understanding of fact or law," but
that was, say, an eyes-open choice made to secure the
patent, "is not 'error' as required by section 251." *Id.* at
1347. That kind of choice is nothing but a "now-regretted
choice," which is not error. *Id.* But this case does not fall
into that category.

The asserted error here is that, when drafting his
original patent, Fleming failed to appreciate the full scope
of his invention and the inadequacy of the original claims
for properly capturing the full scope. This is a classic
reason that qualifies as error. *Id.* at 1348. It identifies a
deficient understanding of some combination of fact and
law bearing on the meaning of claim language, the inven-
tions disclosed in the written description, and how partic-
ular language does or does not map onto products or
processes that could be claimed under section 251 con-
sistent with the written description.

Escort suggests otherwise by noting Fleming's expla-
nation that he wrote his original patent from the perspec-
tive of a "programmer." J.A. 5947, 5980. That fact,

however, in no way undermines the premise of a mistaken understanding of the scope of the written description and/or claims—it actually helps explain the origin of the error. Likewise, the fact that it was marketplace developments that prompted Fleming to reassess his issued claims and to see their deficiencies, J.A. 5926–27, 5945, does not alter the qualifying character of the reason for reissue. Erroneous understandings of the written description or claims are just that, regardless of what triggered the recognition of error in those understandings.

Any reissue patent, of course, must meet all of section 251's requirements. But the only challenge presented by Escort is the lack of "error." That challenge is meritless.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment upholding the jury's verdict.

## AFFIRMED